# EXHIBIT B

**NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA**

**CAUSE NO._____**

| | | |
|---|---|---|
| **BILL COSTEA AND EUGENIA COSTEA,** | § | **In the District Court of** |
| **INDIVIDUALLY AND AS NEXT FRIEND** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **v.** | § | **Bell County, Texas** |
| | § | |
| **BAYLOR SCOTT AND WHITE MEDICAL** | § | |
| **CENTER - TEMPLE, WHITNEY SHEA** | § | |
| **PRINCE, MD, HEATH DOUGLAS** | § | |
| **WHITE, DO, THOMAS RUSSELL** | § | |
| **JONES, MD** | § | |
| | § | |
| | § | |
| **DEFENDANTS.** | § | **____ Judicial District Court** |

**PLAINTIFFS' ORIGINAL PETITION, VERIFIED APPLICATION FOR EMERGENCY TEMPORARY RESTRAINING ORDER, AND TEMPORARY INJUNCTION**

TO THE HONORABLE COURT:

Bill Costea ("Bill"), and wife, Eugenia Costea ("Eugenia") on his behalf, files this Original Petition and Application for Temporary Restraining Order and Injunctive Relief, seeking injunctive relief against Defendants Baylor Scott and White Medical Center - Temple (collectively, "Defendants") and would show unto the Court as follows:

**I.**
**DISCOVERY-CONTROL PLAN**

1.1     Plaintiff requests that a "Level 3" discovery plan be adopted and affirmatively pleads that it seeks injunctive relief. Tex. R. Civ. P. 190.4.

## II.
## BACKGROUND FACTS AND RELIEF REQUESTED

2.1      Bill Costea is a 73 year old, Romanian immigrant and United States citizen, who came to Baylor Scott and White Hospital in Temple, Texas.  Bill arrived at the Defendant's hospital on or around April 17, 2021.  Bill was referred to Defendant's hospital to see a cardiologist specialist.  On April 20, 2021, Mr. Costea was administered a GI Cocktail (oral solution medication) and potentially aspirated some of the contents.  He deteriorated,  and was intubated on April 22, 2021. A tracheostomy was subsequently performed.  Bill's kidneys have begun to decline, but he is awake and responsive. On or around May 19, 2021, Defendants gave Bill's wife, Eugenia, a letter from the Defendant's ethics committee.  Eugenia is Bill's agent under a valid Medical Power of Attorney, and is also the default surrogate decision maker under Chapter 166.039 of the Texas Health and Safety Code.  The letter informed Eugenia that the ethics committee would meet on Tuesday, May 25, 2021 to decide what "future treatment is medically and ethically appropriate for Mr. Costea." Eugenia secured legal counsel and attended the scheduled meeting with her attorney and a representative from Texas Right to Life.

2.2      The Defendant's ethics committee has decided that, against the wishes of Bill's wife and medical power of attorney, on Saturday, June 5, Bill's blood pressure medicines will be discontinued, his food and water withheld, and his ventilator unplugged.  These actions will directly result in Bill's death.

2.3      The notice letter given to Eugenia under Section 166.046(b)(2) failed to properly inform Eugenia of the nature of the meeting. Section 166.046(b)(2) requires the surrogate to be informed the meeting is to discuss the specific directive given by the patient/surrogate.  The Defendant's notice contained no information that Eugenia had issued a directive on behalf of her

husband that was disagreeable to his physician, and that such disagreement was to be discussed and deliberated during the May 25 meeting.

2.4     The statute requires the Defendant give a patient or their surrogate a "copy of the *appropriate* statement set forth in Section 166.052." Emphasis on the word *appropriate*. Instead of providing Eugenia with the portions of the statute applicable and appropriate to her and Bill's situation, Defendant's counsel simply printed off the entire statutory statement. Thus, Eugenia was confronted with two conflicting and confusing statements: one statement that she wanted to remove life support treatment and her husband's physician wanted to continue such treatment, and the second statement that said she wished to continue life sustaining treatment and her husband's physician wanted to cease providing such treatment. Eugenia was rightly alarmed at being accused that she wanted to remove life sustaining treatment, which was never the case.

2.5     Section 166.046(b)(3)(A) does not provide that a hospital counselor ethics committee can merely send the entire statement contained in 166.052 to the patient or surrogate. The statute clearly includes the word "appropriate" to modify the statement contained in 166.052. If the Legislature wanted to sanction a hospital to provide to patients and surrogates the entire statement in 166.052, the Legislature could have merely written this provision to state, "a copy of the statement in 166.052 shall be provided." But they did not. Instead, the Legislature chose to include the word "appropriate," thereby requiring hospitals to choose between the two options presented.

2.6     Failure to adhere exactly to the process in Chapter 166.046 forces the hospital and physician to lose immunity protection under Chapter 166. The Defendant's counsel, who also serves as the Defendant's vice chair of the ethics committee, did not choose between the two options presented. The Defendant failed to comply with 166.046(b)(3)(A). Thus, removing Bill's

treatment on June 5 is outside the scope of Section 166.046 and the limitation of civil, criminal, and administrative liability under Section 166.045."

2.7     The Defendant's notice of the ethics committee meeting was further flawed.  Section 166.046(b)(4)(c) requires that at the time of being so informed of the meeting, the patient or surrogate must be informed that he/she is entitled to a copy of the patient's medical records.  Eugenia was not informed she was entitled to a copy of the medical records; only two days later after she secured legal counsel did the hospital provide records.

2.8     Further, Eugenia was not put on notice regarding exactly what treatment was the subject of the ethics committee meeting.  The notice provided to her makes zero mention of any specific treatment decision she has made on her husband's behalf or what treatment would be discussed. Thus, in a tight time frame that included a weekend, Eugenia nor her attorney knew exactly what treatments to review medical records for, seek a second opinion for or generally prepare to defend Bill's continued treatment. This failure of specificity did not provide Eugenia with reasonable notice to prepare and defend the treatment of her husband.  Subsequently, during the actual ethics committee meeting, Eugenia's counsel repeatedly asked the ethics committee chair what exact treatments of Bill's the committee was being asked to vote on removing.  The ethics chairman could provide no concrete answers, except that he "believed" the treatment at issue was Bill's blood pressure medicine and ventilator.  Incredibly, as evidenced by the Defendant's ultimate decision, the provision of artificial nutrition and hydration was ostensibly voted on by the committee to be removed.  At no point during the committee meeting was food and water discussed as a possible treatment on the table for deliberation.

2.9     No attending physicians of Bill's attended the ethics committee meeting. The statute's purpose is to lay out a procedure by which disagreements over the provision of life-

sustaining care are discussed before an ethics committee meeting. Without the presence of the attending physicians, Eugenia was not given a meaningful opportunity to participate in the ethics committee meeting.

2.10    Additionally, when pressed by Eugenia's legal counsel, the ethics committee chairman could not say which doctor specifically requested the ethics committee review pursuant to Section 166.046.  Due to the lack of attendance by any physicians involved in Bill's care, Eugenia and her attorney were unable to confront or cross-examine the very individuals who allegedly started the process under Section 166.046. In fact, Defendant's attorney commented, "This is not a court hearing, so we don't allow cross-examination." This failure caused many medical questions posed by Eugenia's counsel to go unanswered.

2.11    The "medical case" of the Defendants was a mere 12- to 15 minute "recap" by the ethics committee chairman to members of the committee. At one point, the ethics committee chairman suggested his own assessment of Bill's neurological status which was at odds with a medical records note four days prior.  When the discrepancy was pointed out by Eugenia's counsel, and the question asked what would have caused such a change within the last four days, the ethics committee chairman could offer no response.  As Bill's attending physicians were not present, neither could anyone else confirm the ethics committee chairman's "assessment."

2.12    The letter given to Eugenia informing her of the ethics committee's decision to remove life sustaining treatment from Bill did not comply with Section 166.046(b)(4)(B).  The statute requires Eugenia be given a "written explanation of the decision reached during the review process." Eugenia was instead given a seven sentence, one paragraph letter.  The letter did not state what standard the ethics committee had used to decide to remove treatment, nor did it state

whether the hospital was utilizing an exception under Section 166.046(e) to remove Bill's food and water.  Generally, removal of food and water under Section 166.046(e) is impermissible.

2.13    The Defendant's ethics committee's meeting and "deliberations" were swift. The meeting began at noon and finished at 12:40 pm.   Eugenia's counsel was informed of the ethics committee decision by the Defendant's attorney at 1:20 pm. The severity of the decision being deliberated by the committee and the extremely short time frame for actual deliberations, without even hearing from the attending physicians, strongly suggests a decision was made long before the meeting ever took place.  Such a situation is in direct violation of Section 166.046.

2.14    Section 166.046(d) requires the physician to make a *reasonable effort* to transfer the patient to a physician who is willing to comply with the patient's or surrogate's directive. The onus here is on the *physician.*  The statute requires the hospital to assist the physician, but the statute does not allow the physician to delegate that particular duty to others. Plaintiffs have been provided no information on the personal efforts of the physician or physicians who called the ethics committee meeting together, whomever they might be, to effectuate a transfer for Bill to another provider.  These questions were asked during the May 25 meeting, but due to the absence of any physicians present, the questions went unanswered.  Such a failure to adhere to Section 166.046(d) makes the use of Section 166.046 invalid.

2.15    The notice letter given to Eugenia regarding the upcoming ethics committee meeting read that the meeting would be to consider what future treatment is "medically and ethically appropriate for Mr. Costea." Section 166.046 does not allow for the ethics committee to decide what treatment is ethically appropriate for Mr. Costea.  The word "ethically" or any variation thereof is not found in Section 166.046.  What treatment is ethical is not a  basis for a decision to remove care under Section 166.046, is outside the scope and is not proper to even be

discussed during a Section 166.046 meeting.   Using "ethics," a subjective view that can differ from one person to the next, to underlie a decision to remove care removes all immunity protections under Section 166.046.

### III.
### PARTIES

3.1     Plaintiffs, Bill Costea and his wife Eugenia Costea, are individuals who reside in Bryan, Texas.

3.2     Defendant, Baylor Scott and White Medical Center - Temple, is a non-profit domestic corporation registered under the laws of Texas with a principal place of business in Bell County, Texas. Defendant may be served with process through its attorney of record, Bruce Burleson, 2401 S. 31st Street, Temple, Texas 76508.

3.3     Defendant, Thomas Russell Jones, M.D., chairman of the Baylor Scott and White Ethics Committee in Bell County, Texas.  He is a citizen of Bell County, Texas and may be served at his principal place of business at 2401 South 31st Street, Temple, Texas 76508 at room MS-20-D642.

3.4     Plaintiff specifically invokes the right to institute this suit against Baylor Scott and White - Temple,, in any other name(s) which have been used to designate them (including but not limited to: SCOTT & WHITE MEMORIAL HOSPITAL, d/b/a HILLCREST BAPTIST MEDICAL CENTER and HILLCREST BAPTIST MEDICAL CENTER), or which they have used. Moreover, the Plaintiff expressly invokes his right under Rule 28 of the Texas Rules of Civil Procedure to have the true name of the above-mentioned parties substituted at a later time upon the motion of any party or of this Court. In the event any parties are misnamed or not included herein, such event was a "misnomer," or such parties are or were "alter-egos" of parties named herein. Plaintiff has sued the correct Defendants, but may have misnamed them. Thus, to correct a

misnomer, the Plaintiff henceforth from the filing of this pleading, shall refer to each Defendant as their names appear above.

## IV.
### JURISDICTION AND VENUE

4.1     This Court has jurisdiction over this cause under §24.007 of the Texas Government Code and Article V, Section 8 of the Texas Constitution. Venue is proper in this County under Texas Civil Practices & Remedies Code § 15.002(a)(2) and Texas Civil Practices & Remedies Code § 15.005.

4.2     Plaintiffs believe that the determination of damages in this case should rest squarely within the providence of the jury; however, changes in the law now require Plaintiffs to enumerate a range within their initial pleading. Such a range is provided without the benefit of any discovery in this case and without a full understanding of all the facts a jury will likely review when considering the ultimate resolution of this case. As required by the law, Plaintiffs would state that pursuant to amended Texas Rule of Civil Procedure 47(b) that the damages sought are within the jurisdictional limits of the Court and under Rule 47(c)(5), Plaintiffs seek monetary relief of over $1,000,000.00  and non-monetary relief,

## V.
### CONDITIONS PRECEDENT

5.1     All conditions precedent to Bill's claim for relief have been performed or have occurred, including notification of the Attorney General of Texas, Ken Paxton, of this suit.

## VI.
### INJUNCTIVE RELIEF

6.1     Plaintiffs reallege and incorporate the foregoing paragraphs here as if fully set forth herein. Plaintiffs hereby fully incorporate by reference herein as if fully set forth herein, for all purposes, Exhibits "A-D" attached hereto. The purpose of a temporary restraining order is to

preserve the status quo of the subject matter of the litigation until a preliminary hearing can be held on an application for a temporary injunction. *Cannan v. Green Oaks Apts., Ltd.*, 758 S.W.2d 753, 755 (Tex. 1988) (*per curiam*). The purpose of a temporary injunction is to preserve the status quo of the subject matter of the litigation until a final hearing can be held on the merits of the case. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The status quo is defined as "the last, actual, peaceable, noncontested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (quoting *Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589 (Tex. 1962) (*per curiam*)) (internal quotations omitted).

6.2     Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984). A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion. *Walling*, 863 S.W.2d at 58; *Walker*, 679 S.W.2d at 485.

6.3     In order to obtain a temporary restraining order and a temporary injunction, an applicant must show: 1) a cause of action; (2) a probable right to the relief requested; and (3) imminent irreparable harm in the interim. *Bell v. Texas Workers Comp. Comm'n*, 102 S.W.3d 299, 302 (Tex. App.—Austin 2003, no pet.) (citing *Butnaru*, 84 S.W.3d at 204). Plaintiff is able to establish each of these elements and is therefore entitled to injunctive relief.

A.     <u>**Causes of Action and Probable Right to Relief**</u>

6.4     Plaintiffs reallege and incorporate the foregoing paragraphs here as if fully set forth herein. As a direct result of the actions of the Defendant(s) described above, Eugenia has been stripped of her constitutional liberty right in medical decision making as her husband's medical power of attorney and as his wife without adequate due process of law.  As a direct result of the actions of the Defendants, Bill's constitutional liberty rights and right to life has been stripped

without due process of law.  Without intervention by this Court, Bill will be deprived of his life on June 5, 2021, never having been convicted of a crime, had a day in court, or any procedural due process afforded to him.  He and his wife Eugenia Costea bring the following claim for permanent relief on his/her behalf:

### 1. *Declaratory judgment regarding violation of due process*

6.5     Plaintiffs petition this Court for a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code declaring that, pursuant to the Fourteenth Amendment to the United States Constitution and Article I, Section 19 of the Texas Constitution, Defendants' actions and planned discontinuance of Bill's life-sustaining treatment under the Texas Health & Safety Code infringes upon his right to due process.

6.6     Texas Health & Safety Code §166.046 indicates that if an attending physician refuses to honor a patient's treatment decision, such as continuing life-sustaining treatment, the physician's refusal shall be reviewed by an "ethics committee." Tex. Health & Safety Code § 166.046(a).

6.7     There are no specific restrictions under the act regarding the qualifications of the persons serving on the committee, though the attending physician may not be a member of that committee. *Id*. The statute does not provide adequate safeguards to protect against the conflict of interest inherently present when the treating physician's decision is reviewed by the hospital "ethics committee" to whom the physician has direct financial ties.

6.8     Moreover, an ethics committee is illegal in Texas as it constitutes the corporate practice of medicine which is prohibited under Texas law as the Fort Worth Court of Appeals recently decided in reversing a district court's refusal to grant a temporary injunction to a patient whom the hospital sought to involuntarily passively euthanize under §166.046. *T.L., et al, v. Cook*

*Children's Medical Center*, 607 S.W.3d 9, 59 (Tex. App. – Fort Worth 2020, pet. denied), *certiorari denied by Cook Children's Medical Center v. T.L.*, 2021 WL 78187 (2021) citing *Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 752 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (discussing the statutory prohibition of the corporate practice of medicine).

### a. <u>Texas Health & Safety Code §166.046 violates procedural due process</u>.

6.9     The Fort Worth Court of Appeals recently held in the context of an appeal of the district court's denial of a temporary injunction in a case involving a hospital's utilization of §166.046 as follows – which applies with equal force to the case *sub judice*:

> Because Section 166.046 delegates through this process two traditional and exclusive public functions—(1) the sovereign authority of the state, under the doctrine of *parens patriae*, to supervene the fundamental right of a parent to make a medical treatment decision for her child and (2) the sovereign authority of the state, under its police power, to regulate what is and is not a lawful means or process of dying—the decision rendered thereby constitutes "state action" within the meaning of the Fourteenth Amendment of the United States Constitution and 42 U.S.C.A. § 1983. As a state actor, then, CCMC had to comply with the procedural and substantive dictates of due process before affirming and thereby effectuating such a treatment decision. Because Mother (1) pleaded—and showed a probable right to recover under a viable cause of action—that the committee review process set forth in Section 166.046 and followed by CCMC fails to comply with the dictates of procedural due process, at least as applied in these circumstances, and (2) established that the failure to maintain the status quo ante would result in immediate irreparable harm, the trial court erred by denying Mother temporary injunctive relief, and we reverse the trial court's order denying it.

*T.L. v. Cook, supra,* 607 S.W.3d at 23-24.

6.10     Among other things, Texas Health & Safety Code §166.046 – and Defendants, as state actors – have  violated Bill's right to procedural due process by failing to provide an adequate venue for him and those similarly situated to be heard in this critical life-ending decision. The law also fails to impose adequate evidentiary safeguards against hospitals and doctors by allowing them to make the decision to terminate life-sustaining treatment in their own unfettered discretion. *Id.* at 90. (Noting that the "medically inappropriate" standard in 166.046(e) "even when informed

by reasonable medical judgment, fails to articulate an objective standard by which to decide that the patient's natural death is either her chosen or best treatment option" which, *inter alia,* demonstrated that Mother had shown a probable right to relief in lawsuit challenging the constitutionality of §166.046 and granting temporary injunction.) Finally, the law does not provide a reasonable time or process for a patient to be transferred.

6.11    Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *T.L. v. Cook, supra,* 607 S.W.3d at 76 (finding that by demonstrating the lack of reasonable notice and meaningful opportunity to be heard, Mother showed a probable right to recovery on the procedural due process claim); *see also, Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306 (1950). Plaintiffs can demonstrate the same failure of due process here.

6.12    Procedural due process involves the preservation of both the appearance and reality of fairness so that "no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed against him." *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980). Under traditional notions of due process, the Fourteenth Amendment was "intended to secure the individual from the arbitrary exercise of the powers of government" which resulted in "grievous losses" for the individual. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989).

6.13    Procedural due process expresses the fundamental idea that people, as opposed to things, at least are entitled to be consulted about what is done to them. *See* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW §10-7, at 666 (2d ed. 1988). Modern procedural due-process analysis begins with determining whether the government's deprivation of a person's interest warrants procedural due-process protection. This interest may be either a so-called "core" interest,

i.e., a life, liberty, or vested property interest, or an interest that stems from independent sources, such as state law. *See Board of Regents v. Roth*, 408 U.S. 564 (1972); *Perry v. Sindermann*, 408 U.S. 593 (1972). Procedural due-process analysis next determines what process is due, with courts looking almost exclusively to the Constitution for guidance. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances. *Mathews*, 424 U.S. at 334. This flexible standard includes three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id*. at 335.

6.14    In this case, Bill and Eugenia have not received due process. Bill's private interest affected is quite literally the most important interest there is – his very life. The risk of an erroneous deprivation – death against his wishes and through the Defendant's actions – demands the greatest procedural safeguards. A quick "committee" meeting where participation is suspect and headed by those with a conflict of interest does not pass constitutional muster, as the *T.L.* Court found.

6.15    Under Texas Health & Safety Code §166.046, a fair and impartial tribunal did not and could not hear Bill's case. "Ethics committee" members from the treating hospital cannot be fair and impartial when the propriety of providing Bill life-sustaining treatment must be weighed a potential economic loss to the very entity which provides those "ethics committee" members with privileges and a source of income. Members of a fair and impartial tribunal should not only avoid a conflict of interest, they should avoid even the appearance of a conflict of interest, especially when a patient's life is at stake. That does not occur under §166.046 when a hospital

"ethics committee" hears the case of a patient within its own walls. The objectivity and impartiality essential to due process are nonexistent in such a hearing and were nonexistent in this hearing.

     6.16    Finally, Texas Health & Safety Code §166.046 is so lacking in specificity that no meaningful due process can be fashioned from it and, as a result, it is unconstitutional. For example, it does not contain or suggest any ascertainable standard for determining the propriety of continuing Bill's life-sustaining treatment or the propriety of the attending physician's refusal to honor Eugenia's health-care decisions on behalf of her husband. Thus, the statute is vague, ambiguous, and overbroad and is expected to be declared unconstitutional when T.L.'s case goes to trial. As the Fort Worth Court of Appeals found in determining she was entitled to a temporary injunction pending this trial on the merits:

> "[T]he decision to withdraw life-sustaining medical care from a desperately ill child is one that should rarely involve the courts.... '[T]he decision-making process should generally occur in the clinical setting without resort to the courts, but ... courts should be available to assist in decision making *when an impasse is reached.*'" *A.M.B.*, 640 N.W.2d at 311 (emphasis added) (quoting *In re Rosebush*, 195 Mich. App. 675, 491 N.W.2d 633, 637 (1992)). On these facts, Mother has presented a bona fide complaint that CCMC, in invoking and following Section 166.046's committee review process, failed to provide her adequate procedural due process for the ultimate encroachment on the paramount individual interests at stake. Therefore, Mother has shown a probable right to relief on her Section 1983 claim.

> We reverse the trial court's denial of Mother's application for a temporary injunction, and we remand this case to the trial court to render an order granting the requested temporary injunction pending a final trial on the merits consistent with this opinion. Our previously issued stay order remains in effect until the trial court renders such an order complying with this court's judgment or until superseded by a higher court.

*T.L. v. Cook, supra,* 607 S.W.3d at 94.

     6.17    *T.L.* is the sole case to determine these issues concerning this very problematic statute. The decision is worthy of being followed by this Court.

**b.  Texas Health & Safety Code §166.046 violates substantive due process.**

6.18   It is unquestioned that a competent individual has a substantive privacy right to make his or her own medical decisions. "Before the turn of the century, the Court observed that 'no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'" *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 269 (1990) (quoting *Union Pac. R.R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). "It cannot be disputed that the Due Process Clause protects an interest in life[.]" *Id*. at 281. This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment. In *Cruzan*, the Court noted that the Constitution requires that the state not allow anyone "but the patient" to make decisions regarding the cessation of life-sustaining treatment. *Id*. at 286. The Court went on to note that the state could properly require a "clear and convincing evidence" standard to prove the patient's wishes.

6.19   In this case, there is no evidentiary standard imposed by section 166.046. The doctor and "ethics committee" are given complete autonomy in rendering a decision that further medical treatment is "inappropriate" for a person with an irreversible or terminal condition. This is an alarming delegation of power by state law. When the final decision is rendered behind closed doors, and the Plaintiff is not allowed to challenge the evidence or present his or her own testimony or medical evidence, this does not resemble a hearing with due process protecting the first liberty mentioned in Article I, Section 19 of the Texas Constitution or the Fourteenth Amendment.

**2.   *Defendant has violated Bill's Civil Rights*.**

6.20   Section 1983 of Title 42 of the United States Code guarantees that every person who "under color of any statute…subjects or causes to be subjected, any citizen of the United

States or other person within the jurisdiction thereof to the deprivation of any right…secured by the Constitution…shall be liable to the party in an action[.]" *See* 42 U.S.C. § 1983. Based on the foregoing facts and allegations, a §1983 matter clearly lies in this case as the Fort Worth Court of Appeals found existed in T.L.'s case.

6.21    As set forth above, the only Court to consider this matter, found that the hospital was a state actor:

> Because Section 166.046 delegates through this process two traditional and exclusive public functions—(1) the sovereign authority of the state, under the doctrine of *parens patriae*, to supervene the fundamental right of a parent to make a medical treatment decision for her child and (2) the sovereign authority of the state, under its police power, to regulate what is and is not a lawful means or process of dying—the decision rendered thereby constitutes "state action" within the meaning of the Fourteenth Amendment of the United States Constitution and 42 U.S.C.A. § 1983. As a state actor, then, CCMC had to comply with the procedural and substantive dictates of due process before affirming and thereby effectuating such a treatment decision. Because Mother (1) pleaded—and showed a probable right to recover under a viable cause of action—that the committee review process set forth in Section 166.046 and followed by CCMC fails to comply with the dictates of procedural due process, at least as applied in these circumstances, and (2) established that the failure to maintain the status quo ante would result in immediate irreparable harm, the trial court erred by denying Mother temporary injunctive relief, and we reverse the trial court's order denying it.

*T.L. v. Cook, supra,* 607 S.W.3d at 23-24.

6.22    That same delegation of authority by the state under §166.046 has occurred here. *T.L.* is not limited to its facts and that a child was involved. In fact, in its extensive discussion of this issue, the Court noted that: "In *Cruzan*, the United States Supreme Court implicitly recognized that the decision to discontinue life-sustaining treatment for even an incompetent adult invoked the *parens patriae* authority of the state…" *Id.* at 73 citing *Cruzan ex rel. Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 280 (1990).

6.23    The hospital here is acting in *parens patriae* with regard to Plaintiff, depriving him of his right to medical autonomy and life and his choice of designated surrogate for medical

decision-making. By doing so, this hospital is acting just as much as a state actor as Cook has with regard to T.L.

6.24    Further, by determining what a lawful means of dying is here, the hospital is further utilizing the authority delegated to it by the state and performing yet another state action, just as Cook did in T.L.'s case.

6.25    In addition, even were this hospital a private actor, private actors are subject to regulation under the United States Bill of Rights, including the First, Fifth, and Fourteenth Amendments, which prohibit the federal and state governments from violating certain rights and freedoms when taking state action. Because the Defendants utilize Texas Health & Safety Code § 166.046 to protect their decision to remove life-sustaining treatment, they are taking state action and are subject to Constitutional regulation. *See Rendell-Baker v. Kohn*, 457 U.S. 830 (1982).

6.26    The Supreme Court has set forth a two-pronged inquiry for determining when a private party will be held to be a state actor. First, the Court considers whether the claimed constitutional deprivation has resulted from the exercise of a right or a privilege having its source in state authority. *Georgia v. McCollum*, 505 U.S. 42, 51 (1992) (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922 (1982)). Second, the Court considers several factors relevant to determining whether the private party charged with the deprivation is a person who can, in fairness, be said to be a state actor. *Lugar*, 457 U.S. at 937.

6.27    Private conduct pursuant to statutory or judicial authority is sufficient to establish the first prong. Thus, the Court has held this prong satisfied by a creditor who sought the assistance of state authorities in attaching a debtor's property in a statutorily created pre-judgment attachment procedure, *Lugar*, 457 U.S. at 941-42, and by the racially discriminatory use of peremptory challenges to potential jurors in civil and criminal trials. *See Edmonson v. Leesville Concrete Co.*,

500 U.S. 614, 615 (1991); *McCollum*, 505 U.S. at 51-52. In each case, the Court emphasized that the private party was using a state-created statutory procedure, and was reaping a privilege through the use of the statutorily prescribed procedure. Similarly, doctors and ethics committees empowered by the state to cloak their denial of life sustaining medical treatment with absolute immunity by acting pursuant to the procedures of section 166.046 are exercising a right or privilege having its source in state authority.

6.28    The hospital committee's (illegal) action also satisfies the second prong of the Supreme Court's state-actor test. The Court has laid out three factors that must be considered in answering the question of whether the person charged with a deprivation may be fairly considered to be a state actor: (1) the extent to which the actor relies on governmental assistance or benefits; (2) whether the actor is performing a traditional governmental function; and (3) whether the injury caused is aggravated in a unique way by the incidents of governmental authority. *See Lugar*, 457 U.S. at 942. Each of these factors weighs in support of the conclusion that the hospital "ethics committee" should be held to be a state actor: (1) The committees rely extensively on the state benefit of absolute immunity in determining whether a patient will receive life-sustaining medical treatment; (2) the committee exercises the traditionally exclusive state function of a court when it issues final determinations of legal rights and duties with respect to life-sustaining medical treatment, which cannot be reviewed under any circumstance; and (3) the patient's injury is aggravated by incidents of state authority because the state allows the committee to bind the hands of state authorities with respect to societal protections that would otherwise be available to the patient.

### 3.    *Permanent Injunction*

6.29    The foregoing facts and authorities establish the imminent and irreparable injury that Defendant's conduct poses and Bill's probable right to relief. For these reasons, Bill and his wife also request a permanent injunction, enjoining Defendant from withdrawing life-sustaining treatment pursuant to Texas Health & Safety Code §166.046.

### 4.    *Application for extension of time*

6.30    Plaintiffs seek an extension of his life-sustaining treatment pursuant to section 166.046(g) while a physician or health care facility that will honor his/her/their directives is sought and found. As of the filing of this application, counsel for the Plaintiffs have not been provided with a list of the facilities Defendant has attempted to transfer Bill to, nor any knowledge as to whether physicians have made reasonable efforts to transfer Bill.  The only feedback received by Eugenia was that several facilities declined due to no bed availability.  An extension of time is necessary to wait for a bed to open up and pursue other facilities.  Bill should not die simply because of facilities being crowded, when he is being provided adequate care at Defendant's hospital.  Defendant simply wishes to no longer provide that care.

### 5.    *Section 166.046 process was not validly followed by Defendants.*

6.31    The foregoing facts establish that the Defendant did not properly follow the procedures laid out in Section 166.046 to remove life sustaining treatment from Bill against Eugenia' wishes.  The Defendant did not provide sufficient notice, did not provide the correct statement form Section 166.052, did not inform Eugenia she was entitled to medical records at the time of being informed of the impending meeting pursuant to Section 166.046(b)(4)(c), the physicians have not met their burden to make reasonable efforts to transfer Bill, conducted the meeting on an impermissible basis not contemplated by the statute (what treatment is ethical) and

rendered a decision on such basis, and did not provide notice as to what treatments were to be discussed and deliberated at the meeting.

**B.    Probable Injury**

6.32    Defendants' action of discontinuing Bill's life-sustaining treatment makes it highly probable that he will die, resulting in imminent, irreparable harm to Bill for which there is no adequate remedy at law, just as the *T.L.* Court found. *T.L. v. Cook, supra,* 607 S.W.3d at 23-24.

### *1.  Imminent Harm.*

6.33    On May 25, 2021 Defendant determined that Bill's medical treatment will be discontinued against the wishes and the objection of his wife, Eugenia, after a period of ten days.

### *2.  Irreparable Injury for which there is no adequate remedy at law.*

6.34    If Defendant is allowed to discontinue Bill's treatment, he will suffer the irreparable injury of almost certain death. Bill has no adequate remedy at law because damages cannot adequately compensate him or his wife for the loss of his life. *See Butnaru*, 84 S.W.3d at 204 ("An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard."), citing *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App.—Dallas 1989, no writ).

### VII.
### Application For Temporary Restraining Order

7.1    Plaintiffs reallege and incorporate the foregoing paragraphs and incorporate them here as if fully set forth herein. Plaintiffs seek a temporary restraining order preventing Defendants from terminating life sustaining treatment from Bill Costea. A temporary restraining order serves to provide emergency relief and preserve the status quo until a hearing may be had on a temporary injunction. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). To obtain injunctive relief, "the applicant must plead and prove three specific elements: (1) a cause of action against

the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." See *Butnaru*, 84 S.W.3d at 204. An applicant must plead a cause of action and present some evidence that tends to sustain it to show a probable right of recovery. *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 897 (Tex. App.— Houston [1st Dist.] 2011, no pet.). "[T]he applicant is not required to establish that it will prevail on final trial." *Texas Kidney, Inc. v. ASD Specialty Healthcare*, No. 14-13-01106-CV, 2014 WL 3002425, at *2 (Tex. App.—Houston [14th Dist.] July 1, 2014, no pet.).

  7.2 The Uniform Declaratory Judgment Act and Heinrich each provide Plaintiffs with a cause of action to seek declaratory and injunctive relief against the Defendants. Plaintiffs have a probable right to relief because, for the reason described above, the Defendants' conduct violates the Texas Constitution. Plaintiffs will suffer probable, imminent, and irreparable injury absent a temporary restraining order and temporary injunction because ending life saving treatment will expedite Mr. Costea's death, deprive him of due process, and deprive him of life. Without immediate relief, Plaintiffs will suffer imminent and irreparable harm. The harm to Plaintiffs described herein is a direct and proximate result of the acts of Defendants. The requested temporary restraining order is appropriate to preserve the status quo until a hearing on Plaintiffs' application for temporary injunctive relief can be held. For just cause, Plaintiffs request the entry of a Temporary Restraining Order as follows, and further requests entry of a Preliminary Injunction following a hearing. Plaintiffs will provide Defendants' counsel with notice of this Application for Temporary Restraining Order and hearing on same. Plaintiffs file this Verified Application for Temporary Restraining Order and Other Equitable Relief pursuant to general principles of equity, Texas Rules of Civil Procedure 680, et seq., and Texas Civil Practice and Remedies Code section

65.011. Plaintiff is willing to post a bond as required by Texas law in an amount determined by the Court.

## VIII.
## Grounds For Temporary Injunction

8.1     Plaintiffs re-allege the foregoing paragraphs and incorporates them here as if fully set forth Herein. Plaintiffs request this Court to set Request for Temporary Injunction for hearing and after hearing issue a temporary injunction against Defendant. Additionally, Plaintiffs further request that following a trial on the merits of this case, that the Court enter a permanent injunction against Defendant.

## IX.
## ATTORNEY FEES AND COSTS

9.1     Eugenia and her husband are entitled to their reasonable attorneys' fees and costs incurred in pursuit of this action under the common law and Texas Civil Practice and Remedies Code §37.009 and 42 U.S.C. §1988.

## X.
## CONCLUSION AND PRAYER

10.1    In conclusion, in order to maintain the status quo of the subject matter of the litigation, until a hearing can be held on a temporary injunction—and subsequently, until a final hearing can be held on the merits of the case —Eugenia and her husband seek a temporary restraining order and temporary injunction, prohibiting Defendants from any further actions toward discontinuing Bill's life-sustaining treatment.

10.2    Accordingly, Eugenia and her husband ask that this Court (a) set a bond in the amount it determines to be appropriate and, upon the posting of the bond; (b) issue a temporary restraining order enjoining Defendants from discontinuing Bill's treatment, until a hearing on his request for injunctive relief can be had; (c) set a date and time for a hearing on Bill and Eugenia's

request for injunctive relief and order Defendants to appear and show cause why an injunction should not issue as requested; (d) upon the conclusion of that hearing, convert the temporary restraining order into an injunction enjoining Defendants from the activities listed above and setting a trial date; (e) issue a judgment declaring that Texas Health and Safety Code §166.046 is a violation of the due process requirements of the United States Constitution and the Texas Constitution; (f) issue a judgment declaring that the defendants violated plaintiff's right to procedural due process by failing to provide an adequate venue for him and those similarly situated to be heard in this critical life-ending decision; (g) issue a judgment declaring that the defendants violated plaintiff's right to substantive due process by not allowing the plaintiff to challenge the evidence or present his own testimony or medical evidence regarding his desire to be kept on life-sustaining treatment; (h) issue a judgment declaring that the defendants violated plaintiff's civil rights by depriving him of his right to medical autonomy and life; (i) awarding nominal and/or compensatory damages, and attorneys' fees, for violation of Bill and Eugenia's due process rights; and (j) grant Plaintiffs such other and further relief, both general and special, at law or in equity, to which they may show themselves to be justly entitled.


[signature block on next page]

Respectfully submitted,

Emily K. Cook
SBN: 24092613
The Law Office of Emily Cook
1203 Trinity St.
Liberty, TX 77575
P: 281-622-7268
F: 713-952-2041
ecook@txrtl.com

Ryan A. Luna
SBN: 24102119
Carlson Law Firm
3919 W. Waco Dr.
Waco, Texas 76710
P: 254-772-5653
F: 354-772-3183
rluna@carlsonattorneys.com
Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served upon all parties of record on the 28th day of May 2021, in accordance with the Texas Rules of Civil Procedure.

Exhibits

Exhibit A



and reduce suffering, including artificially administered nutrition and hydration, unless, based on reasonable medical judgment, providing artificially administered nutrition and hydration would hasten the patient's death, be medically contraindicated such that the provision of the treatment seriously exacerbates life-threatening medical problems not outweighed by the benefit of the provision of the treatment, result in substantial irremediable physical pain not outweighed by the benefit of the provision of the treatment, be medically ineffective in prolonging life, or be contrary to the patient's or surrogate's clearly documented desires.

4.  If a transfer can be arranged, the patient will be responsible for the costs of the transfer.

5.  If a provider cannot be found willing to give the requested treatment within 10 days, life-sustaining treatment may be withdrawn unless a court of law has granted an extension.

6.  You may ask the appropriate district or county court to extend the 10-day period if the court finds that there is a reasonable expectation that you may find a physician or health care facility willing to provide life-sustaining treatment if the extension is granted.  Patient medical records will be provided to the patient or surrogate in accordance with Section 241.154, Texas Health and Safety Code.

*"Life-sustaining  treatment"  means  treatment  that,  based  on  reasonable  medical  judgment, sustains the life of a patient and without which the patient will die.  The term includes both life-sustaining medications and artificial life support, such as mechanical breathing machines, kidney dialysis treatment, and artificially administered nutrition and hydration.  The term does not include

Sec. 166.052. STATEMENTS EXPLAINING PATIENT'S RIGHT TO TRANSFER. (a) In cases in which the attending physician refuses to honor an advance directive or health care or treatment decision requesting the provision of life-sustaining treatment, the statement required by Section 166.046(b)(3)(A) shall be in substantially the following form:

When There Is A Disagreement About Medical Treatment:  The Physician Recommends Against Certain Life-Sustaining Treatment That You Wish To Continue

You have been given this information because you have requested life-sustaining treatment* for yourself as the patient or on behalf of the patient, as applicable, which the attending physician believes is not medically appropriate.  This information is being provided to help you understand state law, your rights, and the resources available to you in such circumstances.  It outlines the process for resolving disagreements about treatment among patients, families, and physicians.  It is based upon Section 166.046 of the Texas Advance Directives Act, codified in Chapter 166, Texas Health and Safety Code.

When an attending physician refuses to comply with an advance directive or other request for life-sustaining treatment because of the physician's judgment that the treatment would be medically inappropriate, the case will be reviewed by an ethics or medical committee.  Life-sustaining treatment will be provided through the review.



MS-20-D642
2401 South 31st Street
Temple, Texas 76508
254.724.4127
254.724.5729 Fax
www.BaylorHealth.com

May 19, 2021

Eugenia Costea
Hand-Delivery

RE:    Bill Costea – MRN 9033977

Dear Mrs. Costea:

The Baylor Scott & White Medical Center – Temple Clinical Ethics Committee will be conducting a review of your husband's case on Tuesday, May 25, 2021, at noon. The review will take place at MEC # 114 at the Temple hospital. A map is enclosed to show you where the meeting will take place. You are invited to attend the meeting so that you can provide input for the committee to consider.

This review will take place pursuant to Texas Health & Safety Code § 166.046. Specifically, the committee will consider what future treatment is medically and ethically appropriate for Mr. Costea. Enclosed is a copy of the statement required by § 166.052 of that statute, as well as a copy of the registry required by § 166.053.

Patient Relations can assist you to find the room. Their number is (254) 724 - 3035.

Sincerely,

Bruce Burleson
Vice Chair
Temple Clinical Ethics Committee

You will receive notification of this review at least 48 hours before a meeting of the committee related to your case.  You are entitled to attend the meeting.  With your agreement, the meeting may be held sooner than 48 hours, if possible.

You are entitled to receive a written explanation of the decision reached during the review process.

If after this review process both the attending physician and the ethics or medical committee conclude that life-sustaining treatment is medically inappropriate and yet you continue to request such treatment, then the following procedure will occur:

1.  The physician, with the help of the health care facility, will assist you in trying to find a physician and facility willing to provide the requested treatment.

2.  You are being given a list of health care providers, licensed physicians, health care facilities, and referral groups that have volunteered their readiness to consider accepting transfer, or to assist in locating a provider willing to accept transfer, maintained by the Department of State Health Services.  You may wish to contact providers, facilities, or referral groups on the list or others of your choice to get help in arranging a transfer.

3.  The patient will continue to be given life-sustaining treatment until the patient can be transferred to a willing provider for up to 10 days from the time you were given both the committee's written decision that life-sustaining treatment is not appropriate and the patient's medical record.  The patient will continue to be given after the 10-day period treatment to enhance pain management

You will receive notification of this review at least 48 hours before a meeting of the committee related to your case. You are entitled to attend the meeting. With your agreement, the meeting may be held sooner than 48 hours, if possible.

You are entitled to receive a written explanation of the decision reached during the review process.

If you or the attending physician do not agree with the decision reached during the review process, and the attending physician still refuses to comply with your request to withhold or withdraw life-sustaining treatment, then the following procedure will occur:

1. The physician, with the help of the health care facility, will assist you in trying to find a physician and facility willing to withdraw or withhold the life-sustaining treatment.

2. You are being given a list of health care providers, licensed physicians, health care facilities, and referral groups that have volunteered their readiness to consider accepting transfer, or to assist in locating a provider willing to accept transfer, maintained by the Department of State Health Services. You may wish to contact providers, facilities, or referral groups on the list or others of your choice to get help in arranging a transfer.

*"Life-sustaining treatment" means treatment that, based on reasonable medical judgment, sustains the life of a patient and without which the patient will die. The term includes both life-sustaining medications and artificial life support, such as mechanical breathing machines, kidney



dialysis treatment, and artificially administered nutrition and hydration.  The term does not include the administration of pain management medication or the performance of a medical procedure considered to be necessary to provide comfort care, or any other medical care provided to alleviate a patient's pain.

(c)   An attending physician or health care facility may, if it chooses, include any additional information concerning the physician's or facility's policy, perspective, experience, or review procedure.

the administration of pain management medication or the performance of a medical procedure considered to be necessary to provide comfort care, or any other medical care provided to alleviate a patient's pain.

(b)  In cases in which the attending physician refuses to comply with an advance directive or treatment decision requesting the withholding or withdrawal of life-sustaining treatment, the statement required by Section 166.046(b)(3)(A) shall be in substantially the following form:

When There Is A Disagreement About Medical Treatment:  The Physician Recommends Life-Sustaining Treatment That You Wish To Stop

You have been given this information because you have requested the withdrawal or withholding of life-sustaining treatment* for yourself as the patient or on behalf of the patient, as applicable, and the attending physician disagrees with and refuses to comply with that request.  The information is being provided to help you understand state law, your rights, and the resources available to you in such circumstances.  It outlines the process for resolving disagreements about treatment among patients, families, and physicians.  It is based upon Section 166.046 of the Texas Advance Directives Act, codified in Chapter 166, Texas Health and Safety Code.

When an attending physician refuses to comply with an advance directive or other request for withdrawal or withholding of life-sustaining treatment for any reason, the case will be reviewed by an ethics or medical committee.  Life-sustaining treatment will be provided through the review.

Exhibit B



MS-20-D642
2401 South 31st Street
Temple, Texas 76508
254.724.4127
254.724.5729 Fax
www.BaylorScottandWhite.com

May 25, 2021

Emily Cook, Attorney
ecook@texasrighttolife.com

     RE:   Bill Costea

Dear Ms. Cook:

     As you know, the Baylor Scott & White Medical Center – Temple Clinical Ethics Committee met today to consider the medical team's request to withdraw life-sustaining support from your client, Bill Costea, and to transition him to palliative care. Specifically, this means that the following treatments will be stopped: ventilator support, the administration of pressors, and artificial nutrition and hydration. This letter is being delivered to you by email today, May 25, 2021. Therefore, the 10th day will be June 4, 2021. Under Texas Health & Safety Code §166.046, life-sustaining treatment for Mr. Costea will be stopped on June 5, 2021, unless he is transferred to another facility. BSWMC – Temple will continue to search for facilities to accept Mr. Costea in the interim and will continue to provide life-sustaining treatment. We will also facilitate any transfer that is made during that time.

     If you have any questions, please contact Bruce Burleson at (254) 541-2545.

Sincerely,

Thomas Russell Jones, M.D.
Baylor Scott & White Ethics Committee Chair

CAUSE NO._____

| | | |
|---|---|---|
| BILL COSTEA AND EUGENIA COSTEA, | § | In the District Court of |
| INDIVIDUALLY AND AS NEXT FRIEND | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | Bell County, Texas |
| | § | |
| BAYLOR SCOTT AND WHITE MEDICAL | § | |
| CENTER - TEMPLE, WHITNEY SHEA PRINCE, | § | |
| MD, HEATH DOUGLAS WHITE, DO, | § | |
| THOMAS RUSSELL JONES, MD | § | |
| | § | |
| DEFENDANTS. | § | _____ Judicial District Court |

## AFFIDAVIT OF EMILY COOK

Before me, the undersigned notary, on this day, personally appeared Emily Cook, a person whose identity is known to me. After I administered an oath to her, upon her oath, she said:

"My name is Emily Cook. I am over the age of 18 years, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

1.      I am an attorney licensed to practice law in the State of Texas.

2.      Plaintiffs retained me to represent them in this suit for violation of constitutional rights and misapplication of Section 166.046 in Baylor Scott and White, Temple.

3.      Plaintiffs' retention of me on this case precluded me from accepting other employment.

4.      I have been practicing law for approximately 7 years.

5.      I typically charge $250 an hour when I charge clients on an hourly basis.

6.      The fee I charge is one customarily charged in this area for the same or similar services for an attorney with my experience, reputation, and ability, and considering the amount

Page 1

in controversy, the time limitations imposed, the results obtained, and the nature and length of my relationship with Plaintiffs.

7.    The novelty and difficulty of the questions involved in this case required that I spend hours preparing to attend the ethics committee meeting, travel to the hospital from Liberty, Texas, participate in the ethics committee meeting and the subsequent preparation and filing of the application for temporary restraining order and temporary injunction.    My staff and I have spent a total of 20 hours attempting to prevent the deprivation of my client's due process rights and seeking the cessation of Defendant's implementation of Section 166.046 totaling $5,000.00 in attorney fees.

8.    The breakdown of the above listed total hours is as follows:  6 hours in reviewing the client's documents, correspondence from the hospital,reviewing medical records, consultation with opposing counsel, and securing local counsel. 6.25 hours to write the application for temporary restraining order and temporary injunction, 7 hours for travel to and from the committee meeting at the hospital, and .75 hours for the actual committee meeting."

 

 

_____
Emily Cook


SWORN TO and SUBSCRIBED before me by Emily Cook on this \_\_\_\_\_ day of May, 2010.



_____
Notary Public in and for the
State of Texas

<span style="color:red">**Exhibit D**</span>

## VERIFICATION

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF BELL** | § |

Before me, the undersigned notary public in and for said county and state, on this day personally appeared Eugenia Costea and after being duly sworn, stated upon her oath, that she has read plaintiffs' Verified Original Petition and Verified Application for Temporary Restraining Order, and that the factual statements contained in the Verified Original Petition and Verified Application for Temporary Restraining Order are true and correct based upon her personal knowledge.



_____
Affiant

SUBSCRIBED AND SWORN TO before me this  28th  day May 2021, to which witness my hand and seal.

STEPHANIE M. OLALDE-DIAZ
My Notary ID # 128900162
Expires March 3, 2024

_____
Notary Public, State of Texas

[seal]